## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **National Association of Manufacturers, *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 1:13-cv-01998 (APM)** |
| ) | |
| **Thomas Perez,** ) | |
| **Secretary, U.S. Department of Labor, *et al.*,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

On May 20, 2010, the U.S. Department of Labor promulgated a new federal regulation entitled "Notification of Employee Rights under Federal Labor Laws," which this opinion shall refer to as the "Posting Rule." The Department of Labor developed the Posting Rule in response to an Executive Order issued by the President under the Procurement Act. The Posting Rule requires as a condition of nearly all federal contracts that contractors post workplace notices informing their employees of their rights under the National Labor Relations Act. Contractors subject to the Posting Rule must display such notices in the same manner that they do other notices—physically, electronically, or both. The failure to post can result in cancellation, termination or suspension of the present contract (or part of the contract), or debarment from government contracting.

This case presents constitutional and statutory challenges to the Posting Rule. Plaintiffs National Association of Manufacturers and Virginia Manufacturers Association are trade groups that represent government contractors. They filed suit urging the Court to enjoin the Posting Rule,

contending that (1) the rule compels speech in violation of the First Amendment; (2) the President and the Department of Labor lacked the authority to promulgate the rule under the Procurement Act; (3) the rule is an arbitrary and capricious construction of the Procurement Act; and (4) the rule is preempted by the National Labor Relations Act.

The court concludes that these challenges to the Posting Rule are without merit. The court, therefore, denies Plaintiffs' Motion for Summary Judgment and grants Defendants' Motion for Summary Judgment.

## II.    BACKGROUND

### A.    Creation and Content of the Posting Rule

#### 1.    *Executive Order 13496*

The Posting Rule has its origin in Executive Order (E.O.) 13496, signed by President Obama on January 30, 2009. Exec. Order No. 13496, 74 Fed. Reg. 6107 (Jan. 30, 2009). Invoking his authority under "the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 et seq.," also known as the Procurement Act, the President instituted a requirement that every government contract, unless exempted, include provisions mandating that federal contractors and subcontractors post a notice "describ[ing] the rights of employees under Federal labor laws." *Id*. at 6107-08. The President's stated goal for E.O. 13496 was "to promote economy and efficiency in Government procurement." *Id*. at 6107. The Executive Order explained that "[w]hen the Federal Government contracts for goods or services, it has a proprietary interest in ensuring that those contracts will be performed by contractors whose work will not be interrupted by labor unrest." *Id*. The President concluded:

> The attainment of industrial peace is most easily achieved and workers'
> productivity is enhanced when workers are well informed of their rights under
> Federal labor laws, including the National Labor Relations Act . . . . Relying on
> contractors whose employees are informed of such rights under federal labor laws

facilities the efficient and economical completion of the Federal Government's contracts.

*Id.*

### 2. *The Posting Rule*

President Obama tasked the Secretary of Labor with implementing E.O. 13496 and drafting the required notice. *Id.* The Secretary delegated this task to the Office of Labor-Management Standards within the Department of Labor, which developed the Posting Rule through an informal notice-and-comment rulemaking process. *See generally* "Notification of Employee Rights Under Federal Labor Laws," 75 Fed. Reg. 28,368 (May 10, 2010), ECF No. 16-2. A final version of the Posting Rule was issued on May 10, 2010. *Id.*; *see also* 29 C.F.R. § 471.

The Posting Rule requires federal government contractors and subcontractors to post a notice "in conspicuous places in and about [their] plants and offices where employees covered by the National Labor Relations Act engage in activities relating to the performance of the contract, including all places where notices to employees are customarily posted both physically and electronically." 29 C.F.R. § 471, Subpt. A, App. A. The workplace notice, entitled "Employee Rights Under the National Labor Relations Act" ("the Notice"), consists of three sections, which generally describe (1) collective bargaining rights of employees under the NLRA; (2) anti-union actions that are illegal for employers to perform; and (3) coercive actions that are illegal for unions to use. *Id.* Text at the bottom of the Notice encourages employees who believe their rights have been violated to contact the National Labor Relations Board. *Id.* The lower left-hand side of the Notice states: "This is an official Government Notice and must not be defaced by anyone." *Id.* The lower right-hand side of the Notice features the words "U.S. Department of Labor" and bears the agency's seal. *Id.*; *see also* OFFICE OF LABOR-MGMT. STANDARDS, *Exec. Order 13496: Notification of Emp. Rights Under Fed. Labor Laws*, U.S. DEP'T OF LABOR,

http://www.dol.gov/olms/regs/compliance/EO13496.htm (last visited May 7, 2015) (providing copies of the Notice in multiple languages) [hereinafter *Notice Posting Example*].  A copy of the Notice is appended to this opinion as Exhibit A.

The Notice does not include every recognized labor right.  For instance, as Plaintiffs complain, the Notice does not mention an employee's right to object to payment of dues in excess of the amounts required for representational purposes (a right recognized by the Supreme Court in *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735 (1988)); an employee's right to decertify a union; or an employee's right to refuse to pay dues to a union in a right-to-work state.  Pls.' Mem. of the Nat'l Ass'n of Mfrs. and Va. Mfrs. Ass'n in Supp. of their Mot. for Summ. J., ECF No. 16-1 at 3 [hereinafter Pls.' Mem.].  During the rulemaking process, the Department of Labor received comments that the Notice was underinclusive in its description of employee rights, particularly "rights associated with an anti-union position."  *See* 75 Fed. Reg. at 28,372.  The Department of Labor rejected revising the Notice to acknowledge such rights, "because of space limitations and because of the policy choice, as expressed in Executive Order 13496, to revoke a more explicit notice to employees of *Beck* rights."  *Id.* at 28,379.

If a contractor refuses to comply with the Posting Rule, it may be subject to a wide range of sanctions, including conciliation efforts (a simple correction of the violation and a written promise not to violate the Rule again); cancellation, termination, or suspension of a contract (or part of a contract); or an order of partial or full debarment from contracts with one or more federal agencies.  29 C.F.R. §§ 471.12-471.14.  Cancellation, termination, suspension, and debarment cannot be used as punishments if the contracting agency objects or if the contractor has not been given an opportunity for a hearing.  29 C.F.R. § 471.14.

### B.      Procedural History

Plaintiff National Association of Manufacturers is the largest manufacturing association in the United States, representing both small and large employers.  Compl. ¶ 3, ECF No. 1.  Plaintiff Virginia Manufacturing Association is a member of the National Association of Manufacturers and advocates on behalf of constituent manufacturer-members contributing to the Virginia economy.  Compl. ¶ 4.  On December 18, 2013, Plaintiffs filed a complaint alleging that the Posting Rule and the corresponding Notice promulgated by Defendants—the Department of Labor and various offices and officials within the agency[1]—were unlawful, and requesting that the Posting Rule be preliminarily and permanently enjoined.  Compl. at 12-13.

On May 1, 2014, the parties filed Cross-Motions for Summary Judgment.  *See* Pls.' Mot. for Summ. J., ECF No. 16; Pls.' Mem.; Defs.' Mot. and Mem. for Summ. J., ECF No. 17 [hereinafter Defs' Mem.].  The court held oral argument on the motions on March 27, 2015.

## III.    STANDARD OF REVIEW

Summary judgment will only be granted if the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, the court reviews all "[u]nderlying facts and inferences . . . in the light most favorable to the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of

---

[1] The full list of Defendants identified by Plaintiffs includes Thomas E. Perez in his official capacity as Secretary, United States Department of Labor ("US DOL"); Patricia A. Shiu in her official capacity as Director of the Office of Federal Contract Compliance Programs, US DOL, Employment Standards Administration; Michael J. Hayes in his official capacity as Director, Office of Labor-Management Standards, US DOL; the Office of Federal Contracts Compliance Programs, US DOL, Employment Standards Administration; the Office of Labor-Management Standards, US DOL; and the US DOL itself.  Compl. at 1-2.

litigation.  *Id.* at 248.  A non-material factual dispute is insufficient to prevent the court from granting summary judgment.  *Id.*

Because the court here is reviewing the administrative record, the typical summary judgment standards established in Federal Rule of Civil Procedure 56 are not fully applicable. *See Stuttering Found. of Amer. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).  Instead of resolving factual issues, the district court is tasked with "determin[ing] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)).  On cross-motions for summary judgment, "each side concedes that no material facts are at issue," although this applies "only for the purposes of [each side's] own motion" and does not mean that "a party [has] waive[d] the right to a full trial on the merits." *Sherwood v. Wash. Post,* 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111 (D.C. Cir. 1999)); *see also Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d. 369, 373 (D.D.C. 2013). As described by the Court of Appeals, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Bioscience Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

## IV.   ANALYSIS

### A.   First Amendment Challenge to the Posting Rule

The court begins with Plaintiffs' challenge to the Posting Rule under the First Amendment. Plaintiffs contend that the Posting Rule violates their members' "right to refrain from speaking" by requiring their members, as a condition of contracting with the federal government, to display

what they say is a Notice biased in favor of unionization.  Pls.' Mem. at 6.  They characterize the

posting requirement as "present[ing] federal contractors with an offer they can't refuse: either post

a list of rights slanted in favor of unionization or subject yourself to sanctions up to and including

debarment from federal contracts."  *Id*. at 7.  In short, Plaintiffs contend that the Posting Rule

unconstitutionally requires their members to adopt the Notice as their own speech with which they

disagree.

### 1.    NAM *does not control the result here*

The centerpiece of Plaintiffs' First Amendment argument is the decision in *NAM v. NLRB,*

717 F.3d 947 (D.C. Cir. 2013), *overruled in part by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760

F.3d 18 (D.C. Cir. 2014).  Plaintiffs contend that *NAM* necessarily compels the conclusion that the

Posting Rule is unconstitutional.  *See, e.g.*, Pls.' Mem. at 4-9.  The court disagrees.

In *NAM,* the Court of Appeals addressed a nearly identical notice posting requirement

promulgated by the National Labor Relations Board (NLRB).  The NLRB posting rule required

that "[a]ll employers subject to the NLRA must post notices to employees, in conspicuous places,

informing them of their NLRA rights . . . ."  "Notification of Employee Rights Under the National

Labor Relations Act," 76 Fed. Reg. 54,006, 54,007 (Aug. 30, 2011); *NAM*, 717 F.3d at 950.  The

text of the notice in *NAM* was nearly identical to the text of the Notice at issue here.[2]  *Compare*

29 C.F.R. § 104, Subpt. A, App. A *with* 29 C.F.R. § 471, Subpt. A, App. A.

Non-compliance with the NLRB posting rule subjected employers to potentially harsh

penalties.  The refusal to display the NLRB posting could be considered an "unfair labor practice"

under the NLRA.  *NAM*, 717 F.3d at 950 (quoting 29 C.F.R. § 104.210).  That is, it could "be

---

[2] Indeed, the notice in *NAM* was purposely modeled after the Notice developed under E.O. 13496.  76 Fed. Reg. at 54,018; Pls.' Mem. at 7.  The NLRB even cited E.O. 13496 as support for its decision to create its notice posting rule. 76 Fed. Reg. at 54,007; Pls.' Mem. at 7-8.

found to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by [NLRA] Section 7." *Id*.  In addition, "knowing and willful" noncompliance could be considered "'evidence of antiunion animus in cases in which unlawful motive [is] an element of an unfair labor practice.'" *Id*. at 955 (quoting 76 Fed. Reg. at 54,035-36.).

The Court of Appeals struck down the NLRB posting rule, in part, because the rule's penalty provisions violated section 8(c) of the NLRA.[3]  Section 8(c) "expressly precludes regulation of speech about unionization 'so long as the communications do not contain a threat of reprisal or force or promise of benefit.'" *Id*. at 954 (citation omitted).  Finding a close kinship between section 8(c) and the First Amendment, the court drew parallels between the two, observing that section 8(c) in a sense "merely implements the First Amendment['s]" free-speech rights in the labor context.  *Id*. at 954-55 (citation omitted) (internal quotation marks omitted). Accordingly, the court looked to First Amendment cases to decide whether an employer had a right under section 8(c) *not* to display the NLRB posting.  *Id*. at 956.  The court concluded that, like the right not to be compelled to communicate government speech under the First Amendment, section 8(c) encompassed the right not to disseminate the NLRB posting.  *Id*. at 958-59.  An employer's decision not to post a notice—*i.e.*, a decision to refrain from dissemination of speech— could not, therefore, be used by the NLRB to find "an unfair labor practice . . . or evidence of an unfair labor practice." *Id*. at 959.

---

[3] Section 8(c) provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this [Act], if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

Plaintiffs argue that *NAM*'s discussion of the First Amendment inexorably leads to the conclusion that the Posting Rule at issue here abridges their members' First Amendment speech rights.  But *NAM* does not carry the constitutional weight that Plaintiffs ascribe to it.  As Plaintiffs conceded at oral argument, *NAM* did not announce a First Amendment holding.  Draft Tr. of Oral Arg. at 4-5, *NAM v. Perez*, No. 14-1998 (D.D.C. argued Mar. 27, 2015) [hereinafter "Draft Tr."].  Rather, the Court of Appeals held that the NLRB's posting rule violated a single statute—section 8(c) of the NLRA—because the rule treated the refusal to post as an unfair labor practice and as evidence of anti-union animus.  *NAM*, 717 F.3d at 959.

To be sure, the court in *NAM* did rely on First Amendment jurisprudence to give content to the protections afforded by section 8(c).  But the court also acknowledged that section 8(c) does more than protect the right of free speech in the labor context.  Section 8(c)'s "enactment also manifested a congressional intent to encourage free speech on issues dividing labor and management."  *Id.* at 955 (citing *Chamber of Commerce of the U.S. v. Brown*, 554 U.S. 60, 67 (2008) (internal quotation marks omitted)).  Further, the section "serves a labor law function of allowing employers to present an alternative view and information that a union would not present." *Id.* (citation omitted) (internal quotation marks omitted).  Thus, it would be a mistake to conclude that section 8(c)'s protections in the labor context are co-extensive with the First Amendment's protection of speech.

Moreover, and importantly for this case, the court made clear that the right to silence at issue in *NAM* was rooted only in section 8(c) and should not be confused with a broader right to silence.  The right not to speak under section 8(c), the court concluded, "was only against the Board's finding an unfair labor practice, or evidence therefore."  *Id.* at 959.  "Beyond that," the court observed, "'an employer's right to silence is sharply constrained in the labor context, *and*

leaves it subject to a variety of burdens to post notices of rights and risks.'"  *Id.* (quoting *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003) (emphasis added)). The court again emphasized the limits of section 8(c), stating "that apart from the § 8(c) bar against unfair-labor-practice charges, the National Labor Relations Act did not give employers an unconstrained right to silence."  *Id.*  In view of the Court of Appeals' cabining of its decision to section 8(c), the court declines to read *NAM* to compel the conclusion that the Posting Rule violates the First Amendment.

### 2. *The Posting Rule does not unconstitutionally compel speech*

Having concluded that *NAM* does not determine the result here, the court turns to Plaintiffs' related argument that, under Supreme Court precedent, the Posting Rule unconstitutionally compels speech because it forces Plaintiffs' members to convey speech to its employees that they do not support.  *See* Pls.' Mem. at 2-7.  As a threshold matter, the court agrees with Defendants that the Department of Labor-drafted Notice itself is "government speech."  *See NAM*, 717 F.3d at 956 ("It is obviously correct that the poster contains the Board's speech.").[4]  But that hardly ends the First Amendment inquiry.  Even though the "Government's own speech" is "exempt from First Amendment scrutiny," *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 553 (2005), the First

---

[4] The government-speech doctrine is a relatively recent development in federal case law and the test to determine if something is an example of government speech has not been clearly established. In *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), and in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), the Court suggested that the state's "final approval authority" and "effective control," over a proposed message would affect whether the speech would be classified as government speech. *See Summum*, 555 U.S. at 472-73; *Johanns*, 544 U.S. at 560-61. The Court in *Summum* also highlighted the importance of context and the public perception of the speaker's identity in determining government speech. 555 U.S. at 469-72. Several circuit courts of appeals, however, have found yet another test for government speech. This alternative test, similar to—and at times, derived from—Justice Souter's concurring opinion in *Summum*, poses the question "whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige." 555 U.S. at 487 (Souter, J., concurring); *see, e.g., Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388, 394 (5th Cir. 2014), *cert granted*, 135 S. Ct. 752 (Dec. 5, 2014) (No. 14-144); *Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009); *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 863 (7th Cir. 2008). Whatever the test, the Notice at issue here is plainly government speech.

Amendment nevertheless limits when the government can require a private party to host or communicate government speech.  *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) [hereinafter *FAIR*].

In other words, although the government may regulate the content of what is expressed when it enlists private parties to convey its message, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009), "the First Amendment does not le[ave] it open to public authorities to compel [a person] to utter a message with which he does not agree," *Johanns*, 544 U.S. at 557 (citation omitted) (internal quotation marks omitted).  For example, in *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943), the Court held that schoolchildren could not be forced to recite the Pledge of Allegiance on threat of expulsion from school.  Similarly, in *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court held that that Jehovah's Witnesses could not be compelled to host the slogan "Live Free or Die" on their license plates.

More recently, in *FAIR*, the Court gave its fullest articulation of its "compelled speech" jurisprudence.  There, a group of law schools challenged the Solomon Amendment, which provided that, if any part of an institution of higher education denied equal access to military recruiters, the entire institution would be disqualified from certain federal funding.  *FAIR*, 547 U.S. at 51.  The law schools claimed that the Solomon Amendment abridged their First Amendment freedoms of speech and association, because it compelled them to choose between accommodating a military recruiter's message and ensuring the availability of federal funding.  *Id.* at 53.  In rejecting the law schools' challenge, the Court observed that "[t]he compelled speech violation in each of our prior cases . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate."  547 U.S. at 63.  In those cases, according to the Court, the compelled speech at issue ran afoul of the First Amendment

either because it sufficiently interfered with the host's ability to convey a contrary message or it created an unacceptable risk that the required expression would be viewed as the host's speech. *See id.* at 64-65.  If, however, the objecting party "remain[s] free under the statute to express whatever views they may have . . . all the while retaining eligibility for federal funds," then the statute does not violate the objecting party's First Amendment speech rights. *Id.* at 60.  The Court concluded that, because "nothing in the Solomon Amendment restricts what the law schools may say about the military's policies," and because law school students "can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so," there was no First Amendment violation.  *Id.* at 65.

There is little material distinction between *FAIR* and this case.  The facts differ, but the First Amendment analysis and outcome are the same.  Like the Solomon Amendment, the Posting Rule is a "far cry" from the government-mandated speech deemed unconstitutional in *Barnette* and *Wooley*. *Id.* at 62.  Requiring an employer to post government speech about labor rights is "simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is." *Id.*

Moreover, the Posting Rule does not require a contractor to speak at all.  Rather, the contractor is required to host government speech as a condition of receipt of a federal contract. That, of course, presents a contactor with a choice—agree to post the Notice or forgo federal contracting.  But that choice is no different than the one presented by the Solomon Amendment— either accommodate a military recruiter or forgo federal funds.  *See id.* at 51; *see also Agency for Int'l Develop. v. Alliance for Open Society Int'l., Inc.*, 133 S. Ct. 2321, 2328 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline

the funds," even if the condition itself "may affect the recipient's exercise of its First Amendment rights.").

Additionally, the Posting Rule does not interfere with the contractor's ability to convey a different message. A contractor can still express its own views or engage in lawful activities to discourage unionization. Indeed, nothing in the rule prevents a contractor from creating its own posting and placing it next to the Department of Labor-drafted Notice, so as to make clear that the Notice does not reflect the contractor's own views and its display is government mandated. *See NAM*, 717 F.3d at 958 n.15 ("We suppose an employer could post a statement next to the poster pointing out its compulsory nature."). Likewise, the Posting Rule does not prevent the contractor from displaying an employee's *Beck* rights, if the contractor believes that the Notice's listing of rights is underinclusive. A contractor's speech is thus not "affected by the speech it [is] forced to accommodate." *FAIR*, 547 U.S. at 63.[5]

Nor are employees likely to believe that the Notice is their employer's speech. At oral argument, Plaintiffs admitted that "the majority of Americans may not confuse [the Notice] for anything other than government speech," but nevertheless asserted that "very often employees don't know whose speech that is." Draft Tr. at 12.[6] But common sense dictates otherwise. *See FAIR*, 547 U.S. at 65 ("We have held that high school students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do

---

[5] At oral argument, Plaintiffs asserted that its members feared that, if they posted their own clarifying or dissenting notice, such posting could be used as evidence of "anti-union" animus. Draft Tr. at 9-11. But that prospect is unlikely after *NAM*. *NAM* struck down the NLRB's rule not only because it made the refusal to post an unfair labor practice, but also because it treated the failure to post "as evidence of antiunion animus in cases involving, for example, unlawfully motivated firings or refusals to hire—in other words, because it treats such a failure as evidence of an unfair labor practice." 717 F.3d at 959. In so holding, the court recognized that Congress had intended for section 8(c) to "serve[] a labor law function of allowing *employers* to present an alternative view and information that a union would not present." *Id.* (citation omitted) (emphasis added). Because under section 8(c) the refusal to post cannot be used as evidence of anti-union animus, it logically follows that a truthful, noncoercive counter-posting of different employee rights likewise could not be used as evidence of anti-union animus.

[6] The court will consider this argument, even though the record contains no evidence to support it.

so, pursuant to an equal access policy . . . . Surely students have not lost that ability by the time they get to law school."). The Notice is marked with the words "U.S. Department of Labor," bears the agency's seal, and states "This is an official Government Notice and must not be defaced by anyone." *See* Exhibit A. It also directs the employee to a federal agency—the NLRB—if "you believe your rights or the rights of other have been violated." [7] *Id.* Further, because the federal government requires employers to host a variety of rights notices,[8] employees are likely to be familiar with the concept of government postings and understand that such postings are not their employer's speech. And, as discussed above, an employer may lessen the likelihood that its employees will mistake the Notice for the employer's speech by creating a supplementary rights posting or clarifying notice. Therefore, just as in *FAIR* where "[n]othing about recruiting suggest[ed] that [the] law schools agree[d] with any speech by recruiters," 547 U.S. at 65, nothing about maintaining a clearly drafted government notice suggests that an employer espouses its contents.

Plaintiffs attempt to distinguish *FAIR* on the ground that the Posting Rule "does not require contractors to provide Defendants with equal access to their facilities; rather, it mandates that Plaintiffs post a specific government-authored notice." Pls.' Mem. in Opp'n, ECF No. 18, at 4 [hereinafter Pls.' Opp'n]. The court, however, fails to understand how that distinction is material under the First Amendment. If anything, mandating a government speaker's access to property is far more intrusive than requiring the posting of a rights notice. The content of a live government speaker's expression could vary from visit to visit and from speaker to speaker and could easily

---

[7] The Notice is available in multiple languages, so language should not pose a barrier to employees' understanding of the Notice's source. Available languages include: English, Cantonese, French, Hmong, Laotian, Mandarin Chinese, Somali, Spanish, and Vietnamese. *See, e.g., Notice Posting Example.*

[8] Employers are required to post many notices in the workplace besides the Notice at issue in this case. *See, e.g.,* DEP'T OF LABOR, *Poster Page: Workplace Poster Requirements for Small Businesses and Other Employers,* http://www.dol.gov/oasam/boc/osdbu/sbrefa/poster/matrix.htm (last visited May 7, 2015).

be communicated without the host's knowledge, such as through a private conversation, thereby making it difficult for the host to express disagreement.  By contrast, the Notice is static in its content and its location and its delivery is predictable, making it much simpler for an employer to express contrary views.  Thus, the fact that this case involves a required posting, whereas *FAIR* involved required access, does not produce a different outcome.

Finally, Plaintiffs argue that the result in this case should be different than *FAIR* because the Notice is a "slanted list of rights that unfairly promotes unionization while pointedly omitting a host of other critical employee rights."  Pls.' Opp'n at 4.  Leaving aside the thorny question of how the court would go about deciding whether or not the Notice is "slanted," it is well settled that "when the State is the speaker, it may make content-based choices."  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995); *cf. Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.").  And when the government chooses to speak, the Court has "permitted the *government* to regulate the content of what is or is not expressed when it is the speaker *or when it enlists private entities to convey its own message*."  *Rosenberger*, 515 U.S. at 833 (emphasis added).  Thus, even if the Notice is incomplete, the decision to omit certain rights to effectuate a presidential policy decision does not offend the First Amendment.

## B.    The President's Authority to Promulgate the Rule

Plaintiffs next challenge Defendants' statutory authority to promulgate the Posting Rule, arguing that the Procurement Act did not empower the President and, by extension, the Department of Labor to promulgate it.  Pls.' Mem. at 13-17.  Plaintiffs argue that "[t]he clear intent of the Rule

in the present case is not to foster economic efficiency, but rather to set labor policy under the pretext of economic regulation." Pls.' Opp'n at 8.  Plaintiffs' argument is foreclosed by *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003).

*UAW* involved a challenge to E.O. 13201, which was issued by President Bush on February 17, 2001.  *See* 325 F.3d at 362; *see also* Exec. Order No. 13201, 66 Fed. Reg. 11,221 (Feb. 17, 2001).  (E.O. 13201 was later expressly revoked by E.O. 14396, which is the Executive Order at issue here.  Exec. Order No. 13496, 74 Fed. Reg. at 6110.)  E.O. 13201 required contractors to post notices at their facilities informing employees of what are commonly known as *General Motors* and *Beck* rights, which are "rights under federal law that protect employees from being forced to join a union or to pay mandatory dues for costs unrelated to representational activities." *UAW*, 325 F.3d at 361 (D.C. Cir. 2003).[9]  Whereas E.O. 13496 issued by President Obama would emphasize an employee's right to unionize and to engage in collective bargaining, E.O. 13201 focused on an employee's right to refrain from joining a union and her *Beck* rights.  *Compare* Exec. Order No. 13496, 74 Fed. Reg. at 6107 *with* Exec. Order No. 13201, 66 Fed. Reg. at 11,221-22.

Despite differences in content, the two Executive Orders share critical similarities.  Both President Obama and President Bush invoked the President's authority under the Procurement Act "to promote economy and efficiency in Government procurement."  *Compare* Exec. Order No. 13496, 74 Fed. Reg. at 6107 *with* Exec. Order No. 13201, 66 Fed. Reg. at 11,221.  Both Executive Orders also offered similar rationales for their issuance.  E.O. 13201 offered as its policy rationale:

---

[9] In *General Motors*, the court found that under section 8(a)(3) of the National Labor Relations Act, employees could be required to pay membership dues to a union, in lieu of membership, as a condition of employment.  *N.L.R.B. v. General Motors Corp.*, 373 U.S. 734, 735, 738 (1963).  In *Beck*, the Court held, in part, that even if all employees were required under section 8(a)(3) to pay periodic union dues whether or not they wished to become union members, the union could not expend funds so collected on activities unrelated to collective bargaining activities over the objections of dues-paying nonmember employees.  *Commc'ns Workers of Am. v. Beck*, 487 U.S. at 738, 762-63 (1988).

"When workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced. The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts." Exec. Order No. 13201, 66 Fed. Reg. at 11,221. E.O. 13496 similarly explained that "[t]he attainment of industrial peace is most easily achieved and workers' productivity is enhanced when workers are well informed of their rights under Federal labor laws, including the National Labor Relations Act." Exec. Order No. 13496, 74 Fed. Reg. at 6107. It continued: "Relying on contractors whose employees are informed of [their rights] under Federal labor laws facilities the efficient and economical completion of the Federal Government's contracts." *Id.*

The plaintiffs in *UAW*, as Plaintiffs do here, challenged the President's exercise of authority under the Procurement Act. The Court of Appeals rejected that contention, even though it questioned the President's stated rationale for the posting requirement. *See UAW*, 325 F.3d at 367-68. The court observed that the link between a notice of labor rights and an efficient procurement policy "may seem attenuated" and that "one can with a straight face advance an argument claiming opposite effects or no effects at all." *UAW*, 325 F.3d at 366-67. Nevertheless, the court affirmed the President's exercise of authority, explaining that executive orders promulgated under the authority of the Procurement Act need only have a "sufficiently close nexus to the values of providing the government an economical and efficient system for . . . procurement and supply." *UAW*, 325 F.3d at 366 (D.C. Cir. 2003) (citation omitted) (internal quotation marks omitted). Relying on the "lenien[cy]" of the nexus requirement and the "necessary flexibility" and "broad-ranging authority" afforded the President under the statute, the Court of Appeals rejected the plaintiffs' challenge to the President's action. *Id.* at 366-67.

If the "attenuated" rationale on which E.O. 13201 was premised was adequate in *UAW*, the same result must obtain here. After all, the justifications for the two Executive Orders are nearly identical. *Compare* Exec. Order No. 13496, 74 Fed. Reg. at 6107 *with* Exec. Order No. 13201, 66 Fed. Reg. at 11,221. Plaintiffs argue that *UAW* is distinguishable from this case because "*UAW* . . . did not deal with a one-sided misrepresentation of the rules. Quite the contrary, *UAW* concerned a notice that contained a full, fair and neutral reading of the rights available under *Beck*." Pls' Opp'n at 16. But Plaintiffs fail to explain why a substantively different posting—one that is not claimed to be factually inaccurate—whose promulgation was based on nearly the same rationale found acceptable in *UAW*, compels a different result.[10] It does not.

## C.       The Rule as Arbitrary and Capricious Under the Administrative Procedure Act

Plaintiffs next contend that the Posting Rule violates the Administrative Procedure Act (APA) because it is as an arbitrary and capricious interpretation of the Procurement Act. Pls.' Mem. at 17-18. Under the APA, a court must set aside an agency action, finding, or conclusion if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. 1981). "A reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by statute . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 42-43 (1983). The agency must articulate a "rational connection

---

[10] The court disagrees with Plaintiffs' assertion that the Court of Appeals in *NAM* characterized the similar notice at issue there as "one-sided." Pls.' Opp'n at 15. Instead, the Court of Appeals merely acknowledged that the plaintiffs there, who also are the Plaintiffs here, viewed the posting as "one-sided," without saying whether it agreed with that characterization or not. *See NAM*, 717 F.3d at 958 (stating that "Plaintiffs . . . *see the poster as one-sided*, as favoring unionization, because it 'fails to notify employees, inter alia, of their rights to decertify a union, to refuse to pay dues to a union in a right-to-work state, and to object to payment of dues in excess of the amounts required for representational purposes.'") (quoting the plaintiffs' brief) (emphasis added)).

between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

Plaintiffs argue that the Posting Rule is arbitrary and capricious because "Defendants' justification for the Rule . . . reveals no evidence whatsoever to support the conclusion that requiring all contractors to post a notice in any way improved procurement efficiency." Pls.' Mem. at 17-18. They point to the absence of any studies, analysis, expert opinions, and even an alleged concession by the Department of Labor that "'an argument can be made that the order will have the opposite effect of its stated goal.'" *Id.* at 18 (citing 75 Fed. Reg. at 28,370).[11] But in that respect this case is again no different than *UAW*. The Court of Appeals concluded there that even an "attenuated" link between a *Beck* rights posting and procurement policy was sufficient to pass muster under the Procurement Act, even though "one can with a straight face advance an argument claiming opposite effects or no effects at all." *UAW*, 325 F.3d at 367-68.

Although the posting rule in *UAW* was reviewed under the "lenient" "nexus" standard under the Procurement Act, instead of the APA, the court discerns little practical difference between the two applicable standards in this case. *Compare UAW*, 325 F.3d at 366 (stating that the executive order need only "have a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply'") (citation omitted) *with Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (stating that an agency action will be upheld if it "has considered the relevant factors and articulated a 'rational connection between the facts founds and the choice made'") (citation omitted). The Posting Rule's Notice may indeed have an attenuated link to procurement policy as

---

[11] The Department of Labor did not "actually concede," as Plaintiffs contend, that the Posting Rule could have the "opposite effect of its stated goal." Pls.' Mem. at 18. Rather, the final rulemaking simply noted that *UAW* had approved the *Beck* rights posting under the Procurement Act, even though "an argument [could] be made that the order [would] have the opposite effect." 75 Fed. Reg. at 28,370 (citing *UAW*, 325 F.3d at 367-78).

Plaintiffs contend. But just as the Court of Appeals found that the posting rule in *UAW* passed muster under the lenient "sufficiently close nexus" standard, so too must this court sustain the Posting Rule under the APA.[12]

### D.   Preemption

Plaintiffs' final challenge to the Posting Rule is that it is invalid under two separate theories of preemption—*Garmon* preemption and *Machinists* preemption. Pls.' Mem. at 19-22. Again, the court disagrees.

#### 1.   Garmon *preemption*

The Supreme Court developed the concept of *Garmon* preemption in *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959). "*Garmon* preemption applies to regulation (usually by states)[13] of activities that are arguably 'protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8.'" *UAW*, 325 F.3d at 363. This form of preemption is rooted in the "determination that in enacting the NLRA Congress intended for the [NLRB] generally to exercise exclusive jurisdiction in this area." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 391 (1986).

Decisions about which specific activities fall within the scope of sections 7 and 8 are generally left "in the first instance" to the NLRB. *Garmon*, 359 U.S. at 245. If the NLRB, however, has not decided whether a specific activity falls within those sections, the court must

---

[12] Throughout their briefs and at oral argument, Plaintiffs have characterized the Notice as "one-sided," "slanted," and "misleading." *See, e.g.*, Pls.' Mem. at 2, 3, 8, 21; Pls.' Opp'n at 4, 15-18; Draft Tr. at 5-7, 13, 16-17. Plaintiffs, however, have not argued that the Notice is arbitrary and capricious, and thus violates the APA, because its contents are "one-sided," "skewed," and "misleading." Rather, Plaintiffs' arguments under the APA, as discussed, are (1) Congress did not delegate authority to the President and the Department of Labor to promulgate a rights posting under the Procurement Act, Pls.' Opp'n at 13-17, and (2) even if Congress did so, the final Notice here was arbitrary and capricious because its adoption lacked any evidentiary basis, *id.* at 17-19. Because Plaintiffs have not made the argument, the court does not reach the question whether the Posting Rule violates the APA because it excluded certain recognized employee rights in favor of others.

[13] *Garmon* analysis is equally applicable to regulation of labor-related activities by other federal agencies. *See, e.g.*, *UAW*, 325 F.3d at 363.

assess the activity to determine whether it is "arguably" likely to be protected or prohibited under the NLRA.  *See UAW* at 363-65; *see also Int'l Longshoremen's Ass'n*, 476 U.S. at 397 (stating that, in evaluating an argument for preemption, "a court first must decide whether there is an arguable case for pre-emption; if there is, it must defer to the Board, and only if the Board decides that the conduct is not protected or prohibited may the court entertain the litigation").

Neither side has identified an NLRB ruling holding that the refusal to post a rights notice— the activity whose regulation Plaintiffs claim is preempted—is an activity either protected or prohibited by the NLRA.  Therefore, the court must evaluate whether such activity is "arguably" protected or prohibited under the Act.

a.     Section 8(c)

Turning first to section 8(c), Plaintiffs argue that "8(c) of the NLRA protects the right of employers to remain silent regarding employee rights under the NLRA."  Pls.' Mem. at 21.  In other words, they claim that section 8(c) protects the right of an employer to refuse to post a rights notice.  But that argument is foreclosed by *UAW*.  Asked to enjoin the *Beck* rights notice at issue there on the ground that it was preempted by section 8(c), the court in *UAW* observed that "fitting a *Garmon* claim under the language of § 8(c) is awkward . . . . [T]he activities described in § 8(c) do not 'constitute an unfair labor practice,' except by negation, and are not 'protected *by*' the NLRA, except from the NLRA itself."  325 F.3d at 365.  The court nevertheless considered the *Garmon* claim, but concluded that it did not apply.  *Id.* "[E]ven assuming that the § 8(c) right includes the right not to speak, an employer's right to silence is sharply constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks."  *Id.* Therefore, the court concluded, "plaintiffs have pointed to no specific right covered by the [posting] order that is 'arguably protected by the NLRA.'"  *Id.; see also NAM*, 717 F.3d at 959

21

(confirming that "apart from the § 8(c) bar against unfair-labor-practice charges, the National Labor Relations Act did not give employers an unconstrained right to silence").   The same reasoning—and result—occurs here.   Just as the refusal to post the *Beck* rights notice was not protected activity under section 8(c), the refusal to post the Notice here is not protected activity under that section.

The refusal to post also is not an arguably *prohibited* activity under section 8(c).   This issue was expressly addressed by the court in *NAM*.   *See* 717 F.3d at 959.   Although the NLRB had attempted to prohibit the refusal to post by declaring the refusal to post an unfair labor practice and evidence of anti-union animus, the court held that a refusal to post a government notice could not be prohibited under section 8(c) of the NLRA.   *Id.*   Because *NAM* found that the refusal to post *cannot* be prohibited under section 8(c), and because *Garmon* preemption only applies to an activity that *can be* arguably prohibited (or protected) by the NLRB, the Posting Rule is not preempted under *Garmon*.

b.   <u>Section 7</u>

Seeming to accept that *Garmon* preemption cannot rest on section 8(c), Plaintiffs argue for the first time in their opposition brief that "the Notice unquestionably addresses the protected activities set forth in § 7 of the Act," specifically an employee's "right to refrain" from "the misleading and one-sided presentation of employee rights which favors unionization."  Pls.' Opp'n at 17.  But Plaintiffs fare no better under section 7.  Section 7, entitled "Right of *employees* as to organization, collective bargaining, etc.," provides that "*employees* shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall have the right to refrain from any or all of such activities[.]"  29 U.S.C. § 157

(emphasis added).  It is hard to conceive how section 7, which plainly applies only to an *employee's rights*, could preempt a regulation that speaks only to an *employer's* obligation to post a rights notice.  Because the Posting Rule concerns only what an employer has to do—while section 7 speaks only to employee rights—section 7 does not arguably protect or prohibit an employer's refusal to post a rights notice.

### 2.    Machinists *preemption*

Plaintiffs also claim that the Posting Rule is preempted under *Lodge 76, International Association of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976).  Plaintiffs argue that *Machinists* prohibits regulation of labor-management activities which Congress intended to be unregulated and assert that rights posting is one of these protected activities.  Pls.' Mem. at 21-22.  If Congress wanted a federal agency to have the authority to create a notice posting requirement, Plaintiffs argue, it would have expressly granted such power in the NRLA.  Pls.' Opp'n at 18.  Because no such express rulemaking authority is granted within that statute, Plaintiffs assert that Congress intended that speaking or refraining to speak through a government-required notice should remain unregulated.  *Id.*; *see also* Pls' Mem. at 22; Draft Tr. at 26-28.

In *Machinists*, the Supreme Court was concerned about maintaining the balance between "labor and management [that is] expressed in our national labor policy."  427 U.S. at 146.  The Court found that Congress had intentionally left certain types of employer and employee conduct unregulated "to be controlled by the free play of economic forces."  *Id.* at 140 (citation omitted). These types of unregulable self-help activities comprise "economic weapons" to be used by either the employer or the employee when "more peaceful measures [do] not avail."  *Id.* at 147.  The State "may not prohibit the use of such weapons or 'add to an employer's federal legal obligations

23

in collective bargaining' any more than in the case of employees." *Id.* (citation omitted).   Thus, "*Machinists* preemption applies when a state" or here, another federal agency, "attempts to regulate an activity that, although not necessarily protected or prohibited by the NLRA, is an 'economic weapon' the exercise of which Congress intended to leave unrestricted." *UAW*, 325 F.3d at 363.

To determine if specific self-help-related economic activity is preempted under *Machinists*, the court must ask "whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" *Id.* at 147-48.   Here, the Posting Rule does not "frustrate effective implementation" of the NLRA in regard to the methods available to assist employers and employees in collective bargaining.   Notice posting is not the kind of self-help "economic weapon" that Congress contemplated parties would use in a labor dispute.   *See Machinists*, 427 U.S. at 144.   Indeed, it is difficult to conceive how a government-written and -required rights notice could be used by either employees or employers as leverage in a labor negotiation.   The Notice's sole function is to provide information.   Once posted, its purpose is accomplished.   If a contractor and its employees were then to engage in collective bargaining, the posting itself would exert none of the kind of economic pressure that the Court in *Machinists* held was free from state regulation.[14]   And, even if it did, there is nothing in the Posting Notice that either prevents an employer (or an employee) from posting or distributing other notices to promote their own labor goals or forces an employer to make any comment about the issue at all.   Because the Posting Rule does not frustrate effective implementation of the NLRA by limiting or prohibiting the use of self-help, the Rule is not preempted under *Machinists*.

---

[14] *Machinists* identified an employer's ability to hire permanent replacement employees and to institute a lockout as examples of economic weapons.   427 U.S. at 152-53.   Employee weapons include, among other things, refusing to carry out the employer's work or policies, reporting late to work, engaging in "sit-ins," and picketing and distributing leaflets.   *See id.* at 142.

***

Finally, Plaintiffs appear to make another preemption argument, without giving it that exact label. Both in the context of their argument that the Procurement Rule violates the APA, *see, e.g.*, Pls.' Mem. at 13-17, and in the context of their *Machinists* preemption argument, Pls.' Mem at 22; Draft Tr. at 25-27, Plaintiffs assert that the Department of Labor lacked the statutory authority to promulgate the Posting Rule. The court views this as a broader argument for preemption—namely, that Congress intended to preempt regulations like the Posting Rule by authorizing only the NLRA to implement labor laws.

Plaintiffs' preemption argument stems from the concurring majority opinion in *NAM*, which concluded that Congress did not give the NLRB the authority to promulgate a rights posting requirement. *See* 717 F.3d at 966-67 ("Judge Brown and I would also hold . . . that the Board is without authority to promulgate the posting rule under NLRA section 6.") (Henderson, J., concurring); *see also* Pls.' Mem. at 14-15; Pls.' Opp'n at 14. Their argument continues that, because Congress left the implementation of the NLRA exclusively to the NLRB, *see* 29 U.S.C. § 156, and because the NLRB itself cannot promulgate a posting rule per the concurring majority in *NAM*, 717 F.3d at 717 (concluding "Congress [did not] intend[] to authorize a regulation so aggressively prophylactic as the posting rule"), the Department of Labor likewise lacked the authority to promulgate a posting rule addressing labor rights, Pls.' Mem. at 15; Pls.' Opp'n at 15. "If the NLRB lacks statutory authority to require Notice posting, surely Defendants lack such authority as well." Pls.' Mem. at 15; *see also* Draft Tr. at 25-28 (asserting a "broad field preemption" that limits rulemaking authority in labor law to the NLRB).

The straightforward answer to this argument is that the Posting Rule was not premised on the NLRA, but the Procurement Act. Thus, even if the NLRB lacks the authority to require a labor

rights posting, that statutory limitation does not prohibit the Department of Labor from advancing policy goals under the Procurement Act through a rights posting. *UAW*, 325 F.3d at 367. But Plaintiffs appear to advance a larger point, which is that because Congress intended for the NLRB generally to exercise exclusive jurisdiction with regard to labor relations, *see Int'l Longshoremen's Ass'n*, 476 U.S. at 391, no other federal agency should be able to require a labor rights posting if the NLRB cannot do so itself. Though not without intuitive appeal, Plaintiffs' argument fails because the Supreme Court has never found that Congress intended for the NLRA to occupy the "field" with respect to the regulation of labor concerns. *See UAW*, 325 F.3d at 364. Indeed, the Court has emphasized that "the history of the labor pre-emption doctrine in this Court does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected." *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 188 (1978). Though the Court in *Sears* was concerned with preemption of state regulation, the quoted text underscores the point that Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area.

Here, the President determined that a labor rights posting would further the federal government's interest in efficient and economical completion of government contracts and would foster stability in the delivery of government-contracted services through reducing the risk of labor unrest. *See* Exec. Order No. 13496, 74 Fed. Reg. at 6107. The court is aware of no authority, and Plaintiffs have pointed to none, holding that the NLRA so occupies the field of labor law that an agency of the federal government other than the NLRB cannot promote the government's proprietary interest in efficient and stable contracting through the posting of a labor rights notice.

V.     **CONCLUSION**

For the foregoing reasons, the court concludes that the Posting Rule does not violate the First Amendment; the President had the authority under the Procurement Act to require the posting of a notice as a condition of federal contracts; the Department of Labor's Notice does not violate the APA; and the Posting Rule is not preempted by the NLRA.  Therefore, Plaintiffs' Motion for Summary Judgment is denied, while Defendants' Motion for Summary Judgment is granted.  A separate order accompanies this Memorandum Opinion.


Dated:  May 7, 2015                                         Amit P. Mehta
                                                                      United States District Judge

# EMPLOYEE RIGHTS

## UNDER THE NATIONAL LABOR RELATIONS ACT

The NLRA guarantees the right of employees to organize and bargain collectively with their employers, and to engage in other protected concerted activity.  Employees covered by the NLRA[*] are protected from certain types of employer and union misconduct.  This Notice gives you general information about your rights, and about the obligations of employers and unions under the NLRA.  Contact the National Labor Relations Board, the Federal agency that investigates and resolves complaints under the NLRA, using the contact information supplied below, if you have any questions about specific rights that may apply in your particular workplace.

**Under the NLRA, you have the right to:**

- Organize a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment.
- Form, join or assist a union.
- Bargain collectively through representatives of employees' own choosing for a contract with your employer setting your wages, benefits, hours, and other working conditions.
- Discuss your terms and conditions of employment or union organizing with your co-workers or a union.
- Take action with one or more co-workers to improve your working conditions by, among other means, raising work-related complaints directly with your employer or with a government agency, and seeking help from a union.
- Strike and picket, depending on the purpose or means of the strike or the picketing.
- Choose not to do any of these activities, including joining or remaining a member of a union.

**Under the NLRA, it is illegal for your employer to:**

- Prohibit you from soliciting for a union during non-work time, such as before or after work or during break times; or from distributing union literature during non-work time, in non-work areas, such as parking lots or break rooms.
- Question you about your union support or activities in a manner that discourages you from engaging in that activity.
- Fire, demote, or transfer you, or reduce your hours or change your shift, or otherwise take adverse action against you, or threaten to take any of these actions, because you join or support a union, or because you engage in concerted activity for mutual aid and protection, or because you choose not to engage in any such activity.
- Threaten to close your workplace if workers choose a union to represent them.
- Promise or grant promotions, pay raises, or other benefits to discourage or encourage union support.
- Prohibit you from wearing union hats, buttons, t-shirts, and pins in the workplace except under special circumstances.
- Spy on or videotape peaceful union activities and gatherings or pretend to do so.

**Under the NLRA, it is illegal for a union or for the union that represents you in bargaining with your employer to:**

- Threaten you that you will lose your job unless you support the union.
- Refuse to process a grievance because you have criticized union officials or because you are not a member of the union.
- Use or maintain discriminatory standards or procedures in making job referrals from a hiring hall.
- Cause or attempt to cause an employer to discriminate against you because of your union-related activity.
- Take other adverse action against you based on whether you have joined or support the union.

If you and your coworkers select a union to act as your collective bargaining representative, your employer and the union are required to bargain in good faith in a genuine effort to reach a written, binding agreement setting your terms and conditions of employment.  The union is required to fairly represent you in bargaining and enforcing the agreement.

**Illegal conduct will not be permitted.**  If you believe your rights or the rights of others have been violated, you should contact the NLRB promptly to protect your rights, generally within six months of the unlawful activity.  You may inquire about possible violations without your employer or anyone else being informed of the inquiry.  Charges may be filed by any person and need not be filed by the employee directly affected by the violation.  The NLRB may order an employer to rehire a worker fired in violation of the law and to pay lost wages and benefits, and may order an employer or union to cease violating the law.  Employees should seek assistance from the nearest regional NLRB office, which can be found on the Agency's website: **www.nlrb.gov**.

Click on the NLRB's page titled "About Us," which contains a link, "Locating Our Offices."  You can also contact the NLRB by calling toll-free:  **1-866-667-NLRB (6572)** or (TTY) **1-866-315-NLRB (6572)** for hearing impaired.

**[*]The National Labor Relations Act covers most private-sector employers**.  Excluded from coverage under the NLRA are public-sector employees, agricultural and domestic workers, independent contractors, workers employed by a parent or spouse, employees of air and rail carriers covered by the Railway Labor Act, and supervisors (although supervisors that have been discriminated against for refusing to violate the NLRA may be covered).



This is an official Government Notice and must not be defaced by anyone.

**U.S. Department of Labor**